Mr. Lewis. May it please the court. Good morning, your honors. My name is Goodloe Lewis, Oxford, Mississippi. One of the critical issues in this case is the constitutionality of a geofence warrant, and I will start with a good faith exception to the suppression rule. The biggest problem with applying the good faith exception to this case is that the agents who got this warrant didn't know what they were asking for, they didn't know what they were getting, and they didn't know what Google had to do to get it. This was their first geofence warrant. They were not familiar with the science and technology behind the warrant. If the police are going to use a novel warrant... They may have been there first, but it's certainly not the government's first, right? That's correct. The government had been using geofence warrants quite a bit up to that time and are using them even more today, your honor. But in this particular case... Pardon me. Let me ask you a question. I thought that the... I read in the last week or so that Google is saying, we're not going to do this anymore. That's correct, your honor. Where Google has stopped collecting location history at the account level, it's now at the device level, which would mean that the government would have to have a specific device or account that they wanted to search before they could get this information. And Judge King, that supports our position in this case that there is certainly a privacy interest in that information. It is personal information. It is the property of the account holder. And that sort of brings that... I think crystallizes that issue for the court here today, that Google agrees that it belongs to the account holder. So of course, the key factor that the government did not know, or at least did not disclose to the magistrate when they got this warrant, is that it required Google to search 592 million accounts to obtain the information that they end up getting. And your honor, willful ignorance on the part of the officers in obtaining that warrant should not insulate them from suppression. Franks says that when there is a willful or even reckless failure to disclose information on the part of the government, then the warrant is not valid. And in this case... How often has a court invalidated a search because it was a geofence warrant? So your honor, there are approximately three magistrate ex parte decisions in re-search of Google, which invalidated the warrant, did not accept the warrant. In cases on a full record, as the court is aware, the Chantry case in the Fourth Circuit, which has been argued at the Fourth Circuit, the court found the warrant unconstitutional, but they did not invalidate the warrant. They found it with good faith exception. Right. I am interested in the constitutionality issues for sure, but since you opened with good faith, I'll open with good faith as well, and that's why I'm asking you these questions. Of those decisions, how many preceded the warrant in this case? None. So given that, and I think there are quite a few cases in the other direction, right, saying that the government was allowed to do that. If the record was that stark at the time that this warrant was issued, that doesn't make it constitutional, to be very clear, but doesn't that make it hard for you to prove a lack of good faith? Your honor, my position would be. We can quibble with whether the good faith rule should exist and whether the exclusionary rule should exist, but that's the precedence. How do you show lack of good faith when the record at that time was perfect for the government? Because You have to show that this is unique somehow, right? Well, I believe that the government has, if they're going to use novel technology, they've got to know what it means, what it does, and what Google is required to do. And there is no dispute, if the court reads the record in this case, that these agents didn't know what they were asking for and didn't know what they were getting. They used a form. Your supposition is, notwithstanding the perfect record of approvals that the government had enjoyed to that point, this one was uniquely egregious. Is that the idea? That is true, but I can't speak to any of the other, the facts of the other warrants. Do you understand what I'm asking? You know, again, maybe you should not be required to prove good faith. That's something that you can argue with the Supreme Court of the United States, but we have to deal with that. And so I'm just having trouble seeing how can it be no good faith when the government has never lost and has always won up to that point. It has to be, I think, that there was something uniquely egregious about this geofence warrant that makes it different from all the other ones that had been approved. I'm going to submit to the court that all, I don't think there were any cases one way or the other on the issue in 2018. Okay, it was that, I didn't realize it was that early. Yes, sir. It was a super early one. Yes, sir. There were zero cases on either way on the issue. Certainly been a lot since then, but your point is well taken. And so, your honor, you know, the government made, the agents made representations in the warrant that, you know, based on our experience, knowledge, that sort of thing, you know, we're going to get this technology. Your honor, respectfully, that was a misrepresentation. They did not have knowledge. They did not have experience with these warrants. And I was going to get there eventually, but the bottom line is this is a general warrant. As the court's aware, and this is discussed in the Carpenter case, you know, one of the founding purposes of our country was to eliminate the British general warrant. How would you define a general warrant? Because I admit I'm intrigued by that theory. It's a warrant that doesn't specify what is to be searched and seized. It is a warrant that permits general rummaging, is the language of the case law. And based on identifying an offense, but not much more. Is that? Correct. And so, in this case, the government was, it gave too much discretion to the government to decide what they wanted to seize. Warrants have to be particular. But let me, let me accept that proposition that one of the, if nothing else, the founding principle of the Fourth Amendment is absolutely no general warrants. What makes this a general warrant? Because I understand that this identified not only an offense, but a specific time, a specific place, and that the government would only get that information. I understand Google's searching everybody, he's including, I suppose, everybody in this room, but at least the government's not getting all of that. The government's getting just the narrow piece. What makes that a general warrant? It did not identify the specific account to be searched. It, it, it, again, Your Honor, it did not, it gave the government too much discretion in deciding what to search. The, recall that the government obtained anonymous data, and then, through their own discretion, decided what additional data to obtain from theirs, this three-step process. That's too much discretion, the, you know, the, the warrant has to particularly describe what is to be searched and seized, and that did not occur here. It, it, it, it was. Well, it, again, admittedly, it's a specific time, a specific location, right? Correct. What, again, I'm, I'm, I'm intrigued by this theory. I'm just curious, do you have authority suggesting that the, the general warrant prohibition extends to this type of fact pattern? Do you, what's your sort of best analogy or authority? Um. The general warrant means, to me, as I understand it, the government has identified an offense, and now let us do whatever we want. In fairness, that's not what this warrant is. Maybe this warrant's bad too, but it's not that, is it? Well, I, you know, the Carpenter case talks about general warrants quite a bit, and writs of assistance, and the Carpenter found what the government was doing in that case as, as unconstitutional. They, they, Carpenter said the government required a warrant to do what they, what they did, and so, um, I, I would, I would point to Carpenter as, as the guide star on this case in a lot of different ways. In particular, you know, the third party doctrine, I think Carpenter puts that to rest. Phones are different. There's no, uh, there's no voluntary, I think the court found, no voluntary giving of information which, uh, would, uh, invoke the third party doctrine and, and, you know, invalidate, uh, that, that factor. Well, it, it means, it means that it's a search. Yes. Right? So, in other words, the abrogation of the third party doctrine means you can't say this is the third party's hands, you voluntarily handed it over, no search. Yes. Absolutely this is a search. So, I don't, I don't, I, I get your point that you can't say this is, uh, no, no Fourth Amendment question whatsoever. That still raises the question whether this is a permissible warrant with sufficient particularity. Well, and— Is there something in Carpenter that speaks to that? Okay. I, I believe Carpenter speaks to impermissibility of general warrants. Let me also continue to the Ybarra case, Y-B-A-R-R-A, which basically says you have to particularly describe the, the person and the place that you want to search. You can't just say I want to go search the Apple Tavern, I think it was called, uh, and then the officer decides who to search once they get in there. That's a general warrant, and, and that, that's what happened here. The government got information from Google. They looked at it. They said, I'm going to get that information, I don't care about that, and I'm going to get that information, and that, that is expressly prohibited. Well, so let me ask you a hypothetical question. If the government had convened a grand jury to investigate and bring charges against whomever they found to have committed the crime at issue here and issued a subpoena to Google for this information, uh, would the information—we're talking about data in possession of Google—would that have resolved the constitutional issue, in your opinion? No, Your Honor, I, I believe the issue is the same. It would, would have called on Google to bring information that the government would then rummage through and decide what they wanted and what they didn't want. The, my, my position, Your Honor, would be that the government would have to end that subpoena state. We want Jamar Smith's account information, specifically location data from this, you know, and, and so no, no, Your Honor, I don't believe that would, uh, address that issue. Um, Your Honor, we have a Daubert issue in this case that, that I can turn to. If y'all have any additional questions about the, uh, the, the, the search issue, I'm, I'm happy to address them. Um, I, I didn't want to run out of time on Daubert. So, Your Honor, this was a case where the government, um, presented an expert, uh, that was unable to satisfy even the most basic Daubert requirements, uh, for, uh, testifying about goo, goo, goo, Google and geofence warrants. He had never testified about it before. He had never been as accepted as an expert on the subject before. He did not know if geofence technology had been tested by the scientific community in general. He was not aware of any studies as to, as to its reliability. He did not know the error rate, or even if there was an error rate. He was not aware that the theory had widespread, if the theory had widespread acceptance in the greater scientific community. Indeed, he did not believe there needed to be an investigation of the theory in the greater scientific community. And so therefore, Your Honor, we asserted a, a Daubert objection to him, uh, which, which was denied. And we're, we're asking the court reverse that decision and find that the government has got to do more than that. Um, as the court is aware, there has been a recent amendment to Rule 702. Um, the purpose of that is to try to discourage district judges from punting to the jury, uh, these reliability determinations under the guise of, well, it really just goes to the weight, not the, not the, uh, admissibility. And um, Your Honor, I, I believe that's what the, the trial court did in this case. Just decided, well, I'll just let the jury sort it out. It is clear that the court cannot do that. Court has got to actually, you know, consider the evidence, make a ruling, and decide if, uh, if, if it is reliable, which the, the court assuredly did not do in this case. And, and, Your Honor, we believe that's reversible error. Um, if the court has no further questions, I'll, I'll end here. Thank you, Your Honor. Thank you. You've, uh, uh, I'm sorry, you have not reserved. Your colleague has reserved, right? I'm, I didn't know. Your colleague will rebut? Yes, sir. Okay. Mr. Canici will rebut. Thank you. Bye. Your side has reserved five minutes. Um, Mr. McGee. May it please the court, my name is Clyde McGee, and I represent the United States of Oxford, Mississippi. Your Honor, I first wanted to go to the search of the 592 million people that, uh, that the appellant is arguing was searched in this case. And it, and it obviously hinges on particularity. This case, this warrant was very particular. The agents drew a box around a rural, closed post office. I would submit that the video, uh, I would encourage the bench to, uh, review it. It's a 33-minute video. Besides the mail truck, the two co-conspirators, and another mail employee that arrived on the scene, I counted approximately seven cars that rode by in a 33-minute period. Counsel, did I understand, since we're talking about the factual parameters of what the government was seeking, did I understand correctly from the briefs that Google could not respond with that specificity? In other words, they produced more, because that's how they compiled the request to test how to satisfy the, the search warrant. Were they able to specifically meet the parameters that you just described? Google was able to meet those specific parameters, and, and it resulted in three accounts that were within that hour period on that day when the robbery occurred. And, um, Your Honor, I would, I think the best analogy, uh, and, and you actually hit on this, but the best analogy I think would be when the government sends a, a grand jury subpoena to a bank with a banking account number. The bank does not go through everyone's account and looks and see what you spent your money on. They're not looking at, for example, JPMorgan Chase has a, around 18 million checking accounts. They don't look through every account and look at each transaction. They will type in that number and look for that specific number in their records and produce them to the government. This is similar to what Google did here. The censor vault has just GPS coordinates in the censor vault where they search. They merely got... the bank to produce all checks deposited between 2 p.m. and 4 p.m. on Friday afternoon. Because it's a specific, it gives a specific parameter of GPS coordinates where they would search those, those specific GPS coordinates that, that, in other words, that fell in that GPS coordinate range during that specific time. And it produced three. And so again, I know, I know it's easy to look in hindsight, but the warrant is not general or overbroad when the government searched three accounts. And so it narrowed it down to three. And so, Your Honor, we would submit that... I take it the idea is, uh, it was Google that searched half a billion accounts, not the government. Yes, Your Honor. But what of the fact that Google is doing it at your behest? They're essentially a government agent, right? Well, Your Honor, I think that happens every day with every single search warrant that is sent to a third party. The, the, the... Right, but typically third parties don't do a half billion household search. That's, that's, that's the nub of this, isn't it? Your Honor, I think, for example, a bank who had a large amount of accounts would, would search, they would type in a number to search through all of their 18 million accounts to find one specific account. Similar here, although they had 592 in the censor vault, it resulted in three accounts that were produced to us. And so the question is, I think some courts have, uh, have discussed this. I take it what you're saying is, it's, it's a search of half a billion only in the sort of the most cyber theoretical sense, like it gets narrowed down real quick. Even Google's not reading half a billion account information. That's correct, Your Honor. And, and actually Mr. McInvales, who was, uh, the appellant's, uh, expert at the suppression hearing actually admitted to the same thing. They're not, they're not going through and looking, where was Clyde McGee on that day? Uh, where was, uh, Robert Mims on that day? They're, they're, they don't have that many employees, right? This is a, this is a computer doing it. Okay. Correct. And, and it's similar. I was thinking about earlier. Um, you have a, what's your best authority for the sort of the bank analogy that we've been talking about? I would think, uh, Zurcher, the United States Supreme Court case where, uh, the government searched and there was a police, a riot involving police and assault on police officers. And they searched a, uh, the press for, uh, pictures that, photographs that were taken. So they did not, they didn't know the specific perpetrator, but they went and searched the pictures that occurred on that day and found pictures of, of the police engaged with, uh, citizens of assault on police officers. What was the universe of information being theoretically looked at in that case? Photographs. No, but like how, how many are we talking about? I'm sorry, repeat that. How many? So the question here is, you know, is this, is this case analogous to somebody looking at every customer of a, of a major bank? So I guess what I'm, if you're saying this is the best case, the natural question to ask is what is the theoretical universe of documents being looked at? One person's photographs, a hundred people's photographs. I don't, I'm not, I don't recall it specifying that specific, those specific parameters, but another analogy, uh, would be if, uh, is the security camera. For example, if this farm implement, uh, who had the security camera that was pointed to the post office, if, if that third party, if that farmer said, uh, I'm not going to give this to you voluntarily, well, we would have to go get a warrant and the warrant would not identify perpetrators. And it would, it would, it would look at a small period of time, a one hour period of time where the robbery occurred. And using the appellants argument, we wouldn't even be able to do that because it shows it, it views a specific amount of time of the crime. Isn't that a lot more specific and discreet than asking for the production of hundreds of thousands of digital data, whatever we want to call it, cyber stuff, uh, that's a pretty discreet period of time that you're asking for a, out of a specific camera. That seems to me to be very different than what happened here. That's one thing. Let me ask you another question while I'm, so I don't interrupt you again. Um, once the, the data, this digital data is produced in response to the search warrant and you have now narrowed it down, a law enforcement has now narrowed it down to the two or three people that you're looking for. I'm perplexed why you don't need another warrant to say, well, now I know that it's this particular device, but I need a warrant to get into that device to not only find out who the owner of it is, but also I want to see whatever phone calls and text messages. Why would you not need a subsequent warrant? Seems like you're cabining all of this within this general warrant that produces digital data. Your Honor, we will submit that the, the warrant had sufficient probable cause and particularity to get all of this data at once. The subscriber information, let me back up. When Google produced that information, it was anonymized. So it has anonymous numbers out beside it. And if you think about it, if you, if you really break it down in order to get who, whose account that was, in other words, the name associated, for example, Jamar Smith in this case, technically the government could submit a grand jury subpoena for subscriber information. In other words, there's no Fourth Amendment violation for getting subscriber information. It's not protected by the Fourth Amendment. So I think, I think what we received initially was covered under the warrant. And then when you get to step three, you're outside of the realm of the Fourth Amendment. You're in subscriber land. Does that answer your question, Your Honor? I'll consider it. Thank you. Can I go back to your security camera analogy? So your hypo is security camera for a certain period of time, and that's what you want. What if the government wanted every security camera in the country for a certain period of time, because they're looking for a suspect that day? Your Honor, again, I think this warrant was very particular, but I don't, this is hypothetical. I'm not sure that would be, I'm not sure that would be valid, Your Honor. I would have to, I'd have to think about that. I think that's what the other side is supposing, is this is akin to that. It's searching every account, admittedly, not because they want to read every account. They want to find a very specific interaction in a specific time and place. But the, but the universe is what's horrifying to some. It sounds like you agree that if it's a, if it's looking at every security camera, that too would be excessively broad. So why is that not, if that's problematic, why is this not problematic? Your Honor, it's, so going back to his, or the argument of the appellant, he, one of the main arguments of it being a general warrant is that it does not identify a suspect, that it does not identify a suspect. And I would go back to the Long case, which is Tenth Circuit, and also the Zurcher case I previously noted, and that's where I'm going with the security camera analogy, is it doesn't say we need, we need footage of Jamar Smith robbing the postal worker. It doesn't say that. It, it is asking for what is occurring on the scene at that specific time. And that's similar to the combination of factors that is troubling the other side. It's not just that there's no suspect named. I get your security analogy, security camera analogy solves that. It's both the universe as well as the lack of identification. That combination is what the other side is saying is problematic. Yes, Your Honor. And I, this is, this is what it boils down to in the government's opinion, is that it's, the question is not the size of Google and how big Google is. The question is what the government seized. And I think when, when, when that particular warrant that was supported by probable cause, there was a fair probability that a crime occurred and that Google would have to have evidence of the crime when that was submitted to Google. So you're, it sounds like, I want to, it sounds like you're making an implicit admission. I don't want to make, I want to make it explicit. Suppose the government took all of the Google accounts, all this information into the government's database and then did the search itself. I take it that would not be acceptable in your view? I do not think that would be acceptable. Okay. So then, then what you must be saying is it's because Google is doing it as opposed to the government. Correct. And the government simply getting the results. Similar to what? Why is that any different given that Google is essentially acting at the behest of the government? Why is the government? Why isn't Google essentially the government's agent? Google's not doing this on its own. It's doing it only because the government has asked. Your Honor, I will submit that this, this happens in every single warrant. Every warrant is, is to a third party, excuse me. Every warrant to a third party is searching a bigger expansive group than what is asked for in the law. But not this big. Is there, and that's what, that's going back to my question about the, what's your best case? Like where you have a third party search that is this massive, admittedly with a, a very fine tuned result for the government, but where the baseline search, uh, the underlying database, whatever you want to call it, is this enormous? You haven't. Your Honor, I think there's a, the Miller case cited in my brief discusses, uh, it discusses bank records and, uh, there's another one, Smith v. Maryland, which talks about dialed phone numbers. Those are, those are massive databases. Phone numbers are massive databases. Bank records are massive databases. Um, and every time, again, I don't want to repeat myself, but every time we send a warrant to a bank or a phone company, they are searching maybe millions of customers. As I said earlier, I think JP Morgan case has, Chase has 18 million checking accounts. So I would say almost in every case that happens. Um, Your Honor, I want to, unless the court has any further questions on that. Um, and, and let me back up and say one more thing. As far as the, uh, possibly using a cell phone, the assailant appearing to possibly use a cell phone. I, again, I would encourage the bench to, to watch that video. I think it's pretty clear from the video. It's not crystal clear. It's not an HD, but it's very clear. And there is a way to zoom it. I wanted to mention under VLC, you click tools, video effects, geometry, and then interactive zoom, and you can zoom in and you can see the hand, the elbow bent out. So I did want to mention that, uh, before I moved to Daubert, unless the court has any more questions on the, thank you. The court, the district court found that it was, it was clear, it's the court's language. It was clear that Moody was well qualified to give the testimony he did. He was tendered in cell site and geo location, historical location services, and he was accepted by the court. Uh, and Your Honor, it, it, it all boils down to reliability. There's not a single argument by the appellant that this was, this data was not reliable. There's not a single argument that his, his slideshow or his videos were unreliable. And so I would, I would point the court to the Matthews case out of the 10th circuit where the defendant didn't, they didn't, didn't allege that it was unreliable. This, this, uh, evidence, and, and again, we got cell site data and then we have Google location data. The cell site data, it seems the appellant is somewhat conceding in their brief, not officially, but somewhat. So I'll move to the Google data. The Google data was reliable. It was, it was very accurate to, it came down to 11 meters and on some of these, uh, hits from the defendants, 11 meters, it was very close. Your Honor had helped the trier of fact it was reliable. It was based on sufficient facts. I think the only argument is that he wasn't qualified. Well again, uh, the appellant is arguing that essentially the Daubert, the Daubert checklist is a stringent checklist. Every single one must be checked off. And the Kumho tire Supreme court said the opposite, said that the court may consider these factors and that's not an exhaustive list. So Your Honor, we would submit that he was qualified. It was also corroborated by other data. The Google data was corroborated by the cell site location data. The Google data was corroborated by the security video of the form. It was corroborated by an eyewitness. So all of this data was corroborated and it was indeed accurate. If the court doesn't have any more questions, I would tend to the rest of my time. Thank you. Thank you. Mr. Cheniche. I got lucky. Thank you. Good morning. I'd like to address the geofence. And Judge Ho, with respect to your question about the lack of cases at the time that this search, the geofence application was submitted, we still had Carpenter. We still had Carpenter. And we also had a case that we cite in our brief at page 50, the United States versus $92,422, a Third Circuit case that said, finding general warrants to be so plainly in violation of the particularity requirement that the executing officers could not have reasonably trusted in its legality. We have Carpenter. We have this case that predate the application in this case. And then, of course, we have Ubarra, okay? Ubarra says what it says. And remember, in the record, Google . . . Your point is that you can't, in good faith, request a general warrant. Exactly. Fair enough. But that then begs the question, is that what this is? That's exactly . . . Okay. But you're acknowledging that's the debate is, could somebody in good faith conclude that this was not an impermissible general warrant? Exactly. Okay. And, I mean, there's no particularity here. There's no indication that there's probable . . . you know, warrants have to be extremely specific. When we're . . . when the government . . . I assume you would agree that there was probable cause that a crime was taking place in this location at that time? Certainly there. Okay. Yes, Your Honor. And would you agree that the warrant is intended to capture just those individuals who were in that location in that particular time? That's the idea of it. But the record reflects that Google's accuracy rate is only 68 percent. And there are parameters. That means 32 percent error rate. So . . . Is this on that Step 1? On Step 1. Okay. Yes, Your Honor. Okay. But then the idea is, you then sort of add up other data points, right, to see where else they went and whatnot? Absolutely. Absolutely. But is my understanding in terms of this search, it revealed only three names, or three devices, I should say. No, actually, when the government got results back from Google, my favorite word in this case, the de-anonymized data, it got a number of accounts, four of which they determined were related to a Google account, and the government arbitrarily ruled out one of those and determined that only two of them were the suspects in this case. But to Judge Englehart's question earlier, wasn't there a three-step process that was represented to the magistrate before law enforcement was going to continue to Step 2 and Step 3? Wasn't that concerning that law enforcement didn't go back to the magistrate and get another search warrant? That's exactly what bothered Judge Aycock in this case, Your Honor. The government didn't do that. And so, there's a number of flaws in this case. A number of, you know, when we, when the government seeks a search warrant at a house, for instance, they believe, for instance, drug activity at a house. They get a search warrant for 123 Main Street. They have to describe what the house looks like, where it is, and how many rooms it is. If law enforcement arrive at 123 Main Street, and all of a sudden they realize there's an outhouse or a shed in the back that they want to search, law enforcement has to stop and go get another warrant. Similarly, in this case, so the court recognizes the protections of how particular a warrant must be. Do you want to respond to the analogies in cases that we just heard from the other side? Yes. Banks. Yes. And, you know, they. As I understand it, those involve similar situations. It's a bank that has a lot of customers, and they're theoretically searching, but at the end of the day, it's a computer doing it. It's nobody's, no human being's actually peering into private information. But in Mr. McGee's example of a bank, a warrant on a bank, you've got a bank name. You've got a bank account. You have, oftentimes, a bank, an account person name identified to that bank account. Judge Englehart, I think you recognize, what this warrant is akin to is let's search all transactions for, that belong to this bank, all checks that cleared, or all transactions from 4 o'clock p.m. to 5 o'clock p.m. of everybody's account, okay? A warrant can't be that broad. When in Mr. McGee's example, when they're getting a search warrant on a bank, they're the bank. That's not the case here. Again, Your Honors, we're asking the court to reverse judgment in this case. Thank you very much. Thank you. I see that you accepted, the both of you accepted a court appointment in this matter. The court wants to thank you for your service. Case is submitted.